**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SAUL M.,** <br><br> **Plaintiff,** <br><br> v. <br><br> **COMMISSIONER OF SOCIAL SECURITY,** <br><br> **Defendant.** | Civ. No. 21-02339 (KM) <br><br> **OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Saul M. (identified herein as the "applicant") seeks review pursuant to 42 U.S.C. § 405(g) of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). He argues primarily that the ALJ committed legal error by failing to properly consider the combined effects of his cardiac impairments and learning disorder and by failing to include sufficient explanation of her findings. For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND[1]

Plaintiff applied for SSI on May 30, 2018, alleging disability which began on February 1, 2018. (R. 12.) His claims were denied at the initial and reconsideration levels of administrative review, so at his request ALJ Beth Shillin convened a hearing on January 14, 2020. (R. 12, 29-88.) In a written decision, ALJ Shillin found that the applicant was not disabled from May 30,

---

[1] Certain citations to the record are abbreviated as follows:

"DE" refers to the docket entry numbers in this case

"R." refers to the Administrative Record (DE 7) (the cited page numbers correspond to the number found in the bottom right corner of the page for all DE 7 attachments)

"Pl. Brief" refers to the applicant's brief filed on May 2, 2022. (DE 14.)

2018, the date he submitted his application for SSI, through May 27, 2020, the date she issued her decision. (R. 13, 23-24.) The Appeals Council denied his request for a review on December 11, 2020, and this appeal followed. (R. 1–6.)

## II. DECISION FOR REVIEW

### A. The Five-Step Process and this Court's Standard of Review

The Social Security Administration uses a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. In the first step, the Commissioner determines whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. *Id.* §§ 404.1520(b), 416.920(b). If not, the Commissioner moves to step two to determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, the Commissioner inquires in step three as to whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A. If so, the claimant is automatically eligible to receive benefits (and the analysis ends); if not, the Commissioner moves on to step four. *Id.* §§ 404.1520(d), 416.920(d). In the fourth step, the Commissioner decides whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). The claimant bears the burden of proof at each of these first four steps. At step five, the burden shifts to the Social Security Administration to demonstrate that the claimant is capable of performing other jobs that exist in significant numbers in the national economy in light of the claimant's age, education, work experience, and RFC. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007) (citations omitted).

For the purposes of this appeal, the Court's review of legal issues is plenary. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Factual findings are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings."

*Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence exists to support the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

### B. The ALJ's Decision

The ALJ applied the five-step framework, and her conclusions are summarized as follows:

### Step 1

The ALJ determined that the applicant had not engaged in substantial gainful activity since May 30, 2018, the date of his application. (R. 14.)

### Step 2

The ALJ found that the applicant had the following severe impairments: congestive heart failure, cardiac dysrhythmia, congenital heart disease, hypertension, cannabis abuse, alcohol abuse, and a learning disorder. (R. 14.) The ALJ concluded, however, that the applicant's congenital deformity of his right ear was not severe and did "not cause more than minimal limitation in the ability to perform basic work activities. (R. 14-15.)

### Step 3

The ALJ found that the applicant does not have an impairment or combination of impairments that meets or equals the criteria of any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 15.) Looking first to the cardiac impairments, the ALJ assessed whether the applicant's hypertension, congestive heart failure, cardiac dysrhythmia, and congenital heart disease met the requirements of Listings 4.00, 4.02, 4.05, and 4.06 respectively.[2] (R. 15.) The ALJ cited and explained the medical evidence that

---

[2]   The ALJ noted that "there is no specific listing for hypertension" and so considered the applicability of Listing 4.00(H)(1), which instructs that hypertension is

convinced her none of these listing applied: (1) his hypertension did not sufficiently affect a specific body system such as heart, brain, kidneys, or eyes; (2) his congestive heart failure had not caused the required "episodes of acute congestive heart failure" and he is still able to perform daily life activities and aerobic exercises; (3) his cardiac dysrhythmia had not caused "the required episodes of syncope"; and (4) his congenital heart disease had not caused "cyanosis or the required systolic pressure dysfunction." (R. 15.)

The ALJ next analyzed whether the applicant's learning disorder and substance abuse met the criteria of Listing 12.05, covering intellectual disorders, or Listing 12.02, covering neurocognitive disorders. Though the ALJ failed to cite these Listings by number, she nonetheless cited and applied the relevant regulatory criteria thereunder for evaluating the applicant's impairments. The ALJ first found that criteria matching Listing 12.05's "paragraph A" were not met because the applicant "is able to perform activities of daily living," including dressing, bathing, and feeding himself, and because his prior work history as a delivery driver indicated he has "the mental acumen to obtain and hold significantly gainful employment and pass a driving test."[3]

---

evaluated "by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes)." (R. 15.)

[3]   A claimant's learning disorder meets or medically equals Listing 12.05 when it satisfies either "paragraph A" or "paragraph B" criteria. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05.

To satisfy Listing 12.05's paragraph A criteria, a claimant must demonstrate: (1) "[s]ignificantly subaverage general intellectual functioning" evidenced by a "cognitive inability to function at a level required to participate in standardized testing of intellectual functioning"; (2) "[s]ignificant deficits in adaptive functioning" that are "manifested" by the claimant's "dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing)"; and (3) evidence documenting the claimant's "current intellectual and adaptive functioning" and indicating that the claimant's disorder began at age 21 or earlier. *Id.*

To satisfy Listing 12.05's paragraph B criteria, a claimant must demonstrate: (1) "significantly subaverage general intellectual functioning" evidenced by either "an IQ score of 70 or below" or an "IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below"; (2) "[s]ignificant deficits in adaptive functioning" that are "currently manifested by extreme limitation of

4

(R. 15-16.) Second, the ALJ found that criteria matching Listing 12.05's "paragraph B" were not met because the applicant did not document a sufficiently low IQ score, he possessed only moderate limitations in remembering or applying information, interacting with others, and concentrating, persisting or maintaining pace, and he exhibited mild limitations in adapting or managing oneself. (R. 16-17.) The ALJ also noted that the applicant has sufficient short-term memory to address personal needs without reminders, is able to read and write, and has fewer limitations when given verbal instructions. (R. 16-17.)

The ALJ further explained, albeit with less detail, that the applicant's substance abuse did not meet the requirements articulated by Listing 12.02.[4]

---

one, or marked limitation of two, of the following areas of mental functioning": (a) understanding, remembering, or applying information, (b) interacting with others, (c) concentrating, persisting, or maintaining pace, or (d) adapting or managing oneself; and (3) evidence indicating that the claimant's disorder began at age 21 or earlier. *Id.*

A claimant has an "extreme" limitation in a cognitive or mental area where he is unable to "function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00. A claimant has a "marked" limitation where such functioning is "seriously limited." *Id.*

[4]   A claimant's substance-induced cognitive disorder meets or medically equals listing 12.02 when it either satisfies both "paragraph A" and "paragraph B" criteria, or when it satisfies both the "paragraph A" and "paragraph C" criteria. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.02. As noted below, these criteria both differ from and overlap with those articulated in paragraph A and B of Listing 12.05.

To satisfy Listing 12.02's paragraph A criteria, a claimant must medically document "a significant cognitive decline from a prior level of functioning" in one or more "cognitive areas," specifically: complex attention, executive function, learning and memory, language; perceptual-motor, or social cognition. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.02. To satisfy the Paragraph B criteria of listing 12.02, a claimant must demonstrate that his substance-induced cognitive disorder results in "extreme limitation of one, or marked limitation of two of the following areas of mental functioning":

1. Understand, remember, or apply information.
2. Interact with others.
3. Concentrate, persist, or maintain pace.

5

Noting that the applicant's abuse of alcohol and marijuana did not result in further mental limitations, the ALJ concluded that the applicant's IQ score and mild-to-moderate limitations in mental functioning (as assessed in reference to Listing 12.05) demonstrated that Listing 12.02's paragraph B criteria were not met. (R. 17.) Moreover, the ALJ found that Listing 12.02's paragraph C criteria were not met because the applicant's ability to perform daily life activities showed that he had "more than minimal capacity to adapt to environmental change." (R. 17.)

### Step 4

The ALJ determined that the applicant has the RFC "to perform sedentary work as defined in 20 CFR § 416.967(a) except with the following limitations: never climb ladders, ropes, or scaffolds; no exposure to heavy machinery or unprotected heights; occasionally climb ramps or stairs, crouch, crawl, stoop, kneel, and balance; no exposure to environmental pollutants or extremes of temperature or humidity; directions by visual demonstration or verbally; simple, repetitive, and routine tasks; no contact with the general public and only occasional contact with co-workers and supervisors; and the option to sit/stand at will while remaining on-task." (R. 17-18.) The ALJ stated that the applicant's "cardiac dysfunction [i.e. his congestive heart failure, cardiac dysrhythmia, congenital heart disease, and hypertension] supports the

---

4. Adapt or manage oneself.

*Id.*

Paragraph C of Listing 12.02 states:

> Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (*see* 12.00G2b); and (2) Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

adopted exertional, postural, and environmental limitations" while his "mental impairments [i.e. his learning disorder and history of substance abuse] support the limitation to unskilled work with verbal or visual instructions." (R. 22.)

### Step 5

The ALJ found that the applicant was capable of making a successful adjustment to work that exists in significant numbers in the national economy and concluded that he was not disabled at any time during the relevant time period. (R. 23.) The ALJ considered the extent to which the applicant's exertional and nonexertional limitations limited his ability to perform unskilled sedentary work, concluding based upon the testimony of a vocational expert that the applicant is "able to perform the requirements of representative occupations" found in the Dictionary of Occupational Titles ("DOT"), such as a document preparer, surveillance system monitor, dowel inspector, and table worker. Citing the requirements of Social Security Ruling 00-4p, the ALJ thus found that the vocational expert's testimony was "consistent with the information" contained in the DOT and that a "finding of 'not disabled' is therefore appropriate." (R. 23.)

### III. DISCUSSION AND ANALYSIS

The applicant argues that the ALJ's decision should be overturned because (1) the ALJ's determination of medical equivalence at step three considered his cardiac and mental impairments individually but did not assess their combined effect as required by *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (Pl. Brief at 9-19); and (2) the ALJ provided "literally no articulated explanation" for the applicant's RFC at step four, simply "announc[ing]" the work the applicant is capable of performing without providing any "evidentiary foundation." (Pl. Brief at 19-32). Moreover, though with considerably less explanation, the applicant asserts generally that he is entitled to SSI benefits and that the ALJ's decision is not based on substantial evidence. (Pl. Brief at 5, 7.)

My role on appeal is not to reevaluate whether Plaintiff is entitled to disability benefits. Rather, I am constrained to review the final decision of the

Commissioner, which in this case is the decision of the ALJ, to assess whether it is supported by "substantial evidence" and whether it rests on the application of proper legal standards. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). I do not "weigh the evidence or substitute [my] conclusions for those of the [ALJ] fact-finder." *Williams v. Sullivan*, 879 F.2d 1178, 1182 (3d Cir. 1992).

The threshold of substantial evidence "is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 1157 (2019). If I find that the ALJ's decision rests on substantial evidence, I am bound to uphold the ALJ's factual findings. *See* 42 U.S.C. § 405(g) (the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). However, an ALJ's legal conclusions are subject to plenary review by this Court. *See Poulos*, 474 F.3d at 91; *Schaudeck*, 181 F.3d at 431. Nonetheless, for an ALJ's legal error to warrant a remand, the error must be harmful, i.e., it must have affected the outcome of the case. *See Rutherford*, 399 F.3d at 553; *Cosme v. Comm'r Soc. Sec.*, 845 F. App'x 128, 132 (3d Cir. 2021).

### A. Whether the ALJ committed legal error at step three by failing to explicitly analyze the combined effect of the applicant's cardiac and mental impairments.

At step three, the Third Circuit "requires the ALJ to set forth the reasons for his decision"; an ALJ does not satisfy that duty by "'merely stat[ing] a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning." *Burnett*, 220 F.3d at 119 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)). In *Burnett*, the Third Circuit vacated and remanded an ALJ's ruling where his step-three analysis consisted of a single conclusory statement that the claimant's impairments did not equal the severity of any listed impairment. The Court of Appeals directed the ALJ on remand to "fully develop the record and explain his findings at step three," including an analysis "of whether and why" the claimant's impairments—individually or combined—"are or are not equivalent

8

in severity to one of the listed impairments." *Id.* at 120. Nonetheless, *"Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505; *see also Sassone v. Comm'r of Soc. Sec.,* 165 F. App'x 954, 959 (3d Cir. 2006) (noting that *Burnett* does not "require an ALJ to use 'magic words' in his analysis").

Saul M., the applicant here, claims that the ALJ's decision violated both *Burnett* and SSA regulations because it lacks such consideration of whether his cardiac and mental impairments in combination equal the severity of a listed impairment. (*See* Pl. Brief at 9-19; s*ee also, e.g.,* 20 C.F.R. §§ 416.920(c) (requiring claimants to demonstrate an "impairment or combination of impairments which significantly limits [their] physical or mental ability to do basic work activities"); 416.926(b)(3) ("If you have a combination of impairments, no one of which meets a listing . . . , we will compare your findings with those for closely analogous listed impairments." (citation omitted)). Specifically, he claims that the ALJ did not consider (a) the combined effect of his cardiac impairments; or (b) the combined effect of his cardiac impairments and his learning disorder, taken together. (Pl. Brief at 13-17.) He also urges that the ALJ's decision was legally deficient because it assessed his learning disorder under the wrong listing, incorrectly viewing it as an intellectual disorder under Listing 12.05 rather than as a neurocognitive disorder under Listing 12.02. (Pl. Brief at 18-20.)

The applicant is correct that the ALJ's analysis did not in so many words assess the combined effect of his cardiac and mental impairments, and did not identify by number the listings used to assess his mental impairments. Such failures alone do not necessarily violate *Burnett*. As the Third Circuit has explained, "the purpose of *Burnett* is to guarantee 'sufficient development of the record and explanations of findings to permit meaningful review' of step-three determinations." *Cosby v. Comm'r of Soc. Sec.,* 231 F. App'x 140, 146 (3d Cir. 2007) (quoting *Jones*, 364 F.3d at 505). Thus, an ALJ may satisfy *Burnett* by sufficiently developing the record and explaining her decision at step-three

9

even where she fails to give the most thorough explanation of the combined effects of a claimant's impairments, *see Cooper v. Comm'r of Soc. Sec.*, 563 F. App'x 904, 911 (3d Cir. 2014), or "fails to identify the most relevant listing," *see Cosby*, 231 F. App'x at 146 (citing *Jones*, 364 F.3d at 502, 505). I also note that at step three, it remains the claimant's burden "to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment." *Burnett*, 220 F.3d at 120 n.2.

     The ALJ's decision here could have been more explicit in its consideration of the applicant's impairments combined. Nevertheless, it provides "sufficient explanation to provide meaningful review of the step three determination." *Jones*, 364 F.3d at 505. ALJ Shillin explicitly acknowledged that her decision at step three assessed the severity of the applicant's "impairment or combination of impairments," a recital which, if not undermined elsewhere, is entitled to some deference. (R. 13, 15 (citing 20 CFR § 416.926).) More significantly, the ALJ's paragraphs-long explanation of her step-three analysis is a far cry from the single conclusory statement at issue in *Burnett, see* 220 F.3d at 119, and her decision, "read as a whole," evidences that the ALJ "considered the appropriate factors in reaching the conclusion that [the applicant] did not meet the requirements for any listing," *Jones*, 364 F.3d at 505. The RFC, too, reflects a holistic consideration of the applicant's impairments. Given that the ALJ's decision substantively conformed to precedent and regulation, I cannot find that any mistakes in its form constitute reversible legal error.

     Looking first to the applicant's cardiac impairments, the listings that the ALJ assessed for chronic heart failure (Listing 4.02), recurrent arrhythmias (Listing 4.05), and symptomatic congenital heart disease (Listing 4.06) all require that specified medical criteria all be met: "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Jones*, 364 F.3d at 504 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885 (1990)). The ALJ clearly, albeit briefly, explained that the applicant's

cardiac impairments did not meet these listings' criteria because he could not demonstrate requisite instances of acute congestive heart failure, syncope, cyanosis, and systolic pressure dysfunction. Particularly given the requirement that all criteria be met, it appears unlikely that an explicitly "combined" assessment of cardiac impairments would yield the medical evidence necessary to fulfill these listings' criteria.[5]

As for the applicant's hypertension, the ALJ applied the guidance of Listing 4.00(H)(1) to evaluate the impairment "by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes)," stating that she had conducted a "thorough review of the objective medical evidence" and concluded that there was no evidence that any specific body system was affected to the extent "that it met or medically equaled a listing." (R. 15.) The applicant cites no evidence, in the administrative record or otherwise, contradicting the ALJ's determination, arguing instead that the ALJ should have considered his hypertension in combination with other impairments and committed legal error by failing to detail such "thorough review." (Pl. Brief at 16-17, 17 n.10.) As already noted, this argument fails to explain how a more explicitly combined consideration of the applicant's hypertension would affect the ALJ's analysis of the listings for chronic heart failure, recurrent arrhythmias, or symptomatic congenital heart disease—whether or not the applicant has high blood pressure, he still has not demonstrated the instances of acute congestive heart failure, syncope, cyanosis, systolic/diastolic failure, or secondary pulmonary vascular obstructive disease necessary to find that the criteria of Listings 4.02, 4.05, or 4.06 were met. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A §§ 4.02, 4.05, and 4.06. I therefore cannot find that the ALJ's discussion of the applicant's hypertension at step three, though brief, amounts to legal error. Here, the ALJ concluded that "no evidence" suggested a listing was met and

---

[5]   Indeed, the applicant concedes that no record evidence demonstrated syncope as required under Listing 4.05 and does not contest that there was insufficient evidence of cyanosis or systolic dysfunction. (Pl. Brief at 16 n.8.)

11

she later reviewed evidence of the applicant's hypertension in determining his RFC. (R. 15, 19-20); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A § 4.00(H)(1) ("We will also consider any limitations imposed by your hypertension when we assess your residual functional capacity."). To say that the ALJ's analysis was incomplete is ordinarily to suggest that something consequential was glossed over or omitted. Here, the applicant cannot cite any specific evidence contradicting the ALJ's finding. I will not plumb the depths of the record further to add detail to his claim that the ALJ's analysis was insufficiently explicit or detailed.

  The applicant's argument that the ALJ did not consider the combined impact of his learning disorder and cardiac impairments is no more availing. He explains that the learning disorder has "complicated his ability to understand and carry out the numerous life-saving measures, medications and procedures recommended by his cardiologists." (Pl. Brief at 13, 18.) Indeed, in determining the applicant's RFC at step four, the ALJ noted that the applicant had in fact been non-compliant with his medications and use of a cardiac "life vest," i.e., a personal defibrillator worn by a person at risk for cardiac arrest. (R. 18, 20.) Without minimizing the applicant's condition, I note again that he provides no explanation of how these complications in treating his cardiac impairments compensate for the dearth of evidence that he meets the criteria of the relevant cardiac listings. And the applicant's failure to explain how a combined analysis of his cardiac impairments would alter the ALJ's result suggests that even if the ALJ committed legal error, it was not harmful in the sense of being consequential to the result. *See Rutherford*, 399 F.3d at 553. Without more, I cannot find that the applicant has shown legal error requiring a remand. *See Cooper*, 563 F. App'x at 911.

  Finally, I cannot find legal error in the ALJ's assessment of the applicant's learning disorder as an intellectual disorder under Listing 12.05 rather than as a neurocognitive disorder under Listing 12.02. The bottom-line analysis, however, concerns the effect on the claimant's ability to function. The two listings look to similar kinds of evidence of mental impairment relevant to

12

learning disorders, though they are structured differently. To meet or equal Listing 12.02, claimants must fulfill either its "paragraph B" or "paragraph C" criteria. Listing 12.02's paragraph B requires claimants to show "extreme limitation of one, or marked limitation of two" areas of "mental functioning": (1) "[u]nderstand, remember, or apply information"; (2) "[i]nteract with others"; (3) "[c]oncentrate, persist, or maintain pace"; and (4) "[a]dapt or manage oneself." Listing 12.02's paragraph C requires claimants to demonstrate that the mental impairment at issue is "serious and persistent" by showing that they receive "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting" and have a "minimal capacity to adapt to changes in [their] environment or to demands that are not already part of [their] daily life." In comparison, to meet or equal Listing 12.05 requires claimants to fulfill either its "paragraph A" or "paragraph B" criteria, both of which require evidence of "significantly subaverage general intellectual functioning" and "significant deficits in adaptive functioning." Under paragraph A, these may be shown by a claimant's inability to participate in standardized testing and dependence on others for personal needs; under paragraph B, these may be shown using a claimant's IQ scores and "extreme limitation of one, or marked limitation of two" areas of "mental functioning," that match the four listed in Listing 12.02's paragraph B.

  Thus, even if I assume that the applicant is correct that Listing 12.02 was the listing most relevant to his learning disorder, the ALJ's failure to identify this listing does not constitute reversible error because she nonetheless satisfied *Burnett*'s requirement of "fully analyzing the medical evidence contained in the record and explaining that analysis in an opinion." *Cosby*, 231 F. App'x at 146 (citing *Jones*, 364 F.3d at 502, 505). Indeed, the ALJ's conclusion pursuant to Listing 12.05's paragraph B that the applicant had only moderate or mild limitations in his ability to "[u]nderstand, remember, or apply information," "[i]nteract with others," "[c]oncentrate, persist, or maintain pace," and "[a]dapt or manage [him]self" applies with equal force to Listing 12.02 paragraph B because the two sets of criteria are identical. The ALJ's remaining

13

analysis under Listing 12.05 and elsewhere in her opinion similarly reflect that the applicant failed to meet Listing 12.02's paragraph C requirement of a "serious and persistent" mental impairment. As the ALJ noted, the only "mental health therapy" or "psychosocial support" that the applicant's learning disability necessitated was that he formerly received special education schooling. (R. 16, 18, 20, 368.) Moreover, rather than exhibiting a "minimal capacity to adapt to changes in [his] environment," the applicant himself reported that he has "no deficits with handling stress or changes in routine." (R. 17, 215.) Whether or not the ALJ chose or cited the most relevant listing in assessing the applicant's learning disorder, she analyzed the relevant evidence, explained her reasoning, and concluded that his mental impairments did not meet criteria that would satisfy either Listing 12.02 or 12.05. Thus, reading the ALJ's opinion "as a whole," I find that her analysis and conclusion do not reflect legal error. *Jones*, 364 F.3d at 505. And, on this record, I cannot find that this claimed legal error had any likelihood of affecting the result.

### B. Whether the ALJ provided sufficient explanation for the step-four determination of RFC

The applicant argues that the ALJ committed legal error in determining his RFC because (1) it contained "literally no articulated explanation for the decisional RFC"; and (2) it was based on testimony of a vocational expert ("VE") that "does not fit [the applicant's] education or vocational profile." (Pl. Brief at 19.)

While the applicant is correct that an ALJ who fails to provide any explanation for her RFC determination has committed clear legal error, such is not the case here. The ALJ's explanation for her RFC determination runs over four pages, so the claim that she provided "literally no articulated explanation for the decisional RFC" is pure hyperbole. Viewed more charitably, this argument suggests that the ALJ committed legal error by failing to sufficiently explain her analysis of the evidence relating to the applicant's RFC, as required under *Burnett* and related precedent. (See Pl. Brief at 20-21, 24-26.) An ALJ at step four "must consider all the evidence" before her and "must give some

14

indication of the evidence which [she] rejects and [her] reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) and *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The applicant suggests that the ALJ failed to articulate any such analysis and committed legal error by "announc[ing]" without explanation that he is capable of sedentary work and failing to consider evidence that his cardiac impairments caused him fatigue. (Pl. Brief at 24-26, 27-29.)

The ALJ's decision, though the applicant disagrees with the result, nevertheless evidences the type of substantive discussion of the evidence required by *Burnett*. Rather than merely "announcing" her conclusion, the ALJ provided a detailed explanation of the evidence that she relied upon to find that the applicant is capable of sedentary work. First, treatment records from August 2018 indicated that despite his history of cardiac problems, the applicant "had normal heart sounds and normal pulmonary effort" and could "walk without shortness of breath," "climb stairs," "perform aerobic exercises," and lift up to ten pounds. (R. 18, 21.) Second, two state agency consultants found, based in part on an assessment of the applicant's cardiac dysfunction, that he had exertional and postural limitations that limited his ability to walk or stand but were consistent with sedentary work. (R. 21.) Indeed, the ALJ partially rejected the findings of a consultative examiner who found that the applicant had no limitations in "balance or manipulative activities" and could "sit, stand, and walk with reasonable breaks" because these findings were inconsistent with the applicant's cardiac impairments and other record evidence. (R.21.) The ALJ's analysis of the evidence not only contradicted the applicant's claim that he could not perform sedentary work due to shortness of breath, fatigue, and inability to follow his medication treatment (R. 18), it also provided the necessary explanation of how the ALJ weighed the evidence and arrived at her RFC determination, *see Burnett*, 220 F.3d at 121.

As for the applicant's second argument, he has simply failed provide any detail by which to assess his claim that the VE's testimony was unsupported by the applicant's "educational or vocational profile." (Pl. Brief at 19.) The ALJ

15

heard testimony of a VE at step four to assess the extent to which the applicant's exertional or non-exertional limitations "erode the unskilled sedentary occupational base," asking the VE "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (R. 23.) Though the headings of the applicant's brief would suggest he takes some issue with the education, work experience, and RFC that the ALJ assigned to him and conveyed to the VE as the basis for his question, the form of this argument remains undefined. Indeed, the only references to the VE testimony in the body of the applicant's brief are contained within two footnotes noting that the VE based his testimony on outdated occupational information and testified that the sedentary jobs encompassed by the applicant's RFC would not afford him "additional work-time breaks, not afforded healthy coworkers." (Pl. Brief at 27 n.11, 30 n.12.) The court is unable to analyze this undeveloped argument, which is too indefinite and formless to establish any legal error in the ALJ's decision.[6]

### C. Whether the ALJ's decision was supported by substantial evidence.

The applicant's final argument that the ALJ's decision lacked a basis in substantial evidence, to the extent it is intended to be independent of the claims of error discussed above, is neither articulated with much detail nor supported by the record. The applicant's brief takes pains to clarify that the primary arguments concern legal error, not a lack of substantial evidence. (*See, e.g.*, Pl. Brief at 5, 7, 25 (arguing that the ALJ's failure to make "precise findings required by the Commissioner's published RFC standards" regarding the applicant's capacity for sedentary work cannot "be ascertained and

---

[6] I also observe that even if the claim is viewed (generously) as one that the VE's testimony "cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert," such an argument would be unavailing. *Rutherford*, 399 F.3d at 554 n.8. As noted by the Third Circuit, such arguments "are really best understood as challenges to the RFC assessment itself." *Id.* I have found no error in the RFC.

subjected to the substantial evidence rule").) In rejecting the applicant's claims of legal error, I have already concluded that the ALJ's decision reflected a thorough analysis of the evidence and sufficient explanation of the ALJ's conclusions. Accordingly, I will reject the applicant's general substantial-evidence challenge.

## IV.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

A separate order will issue.

Dated: August 17, 2022

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**